# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRENDA J. ELIJAH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  04-CV-761-SAJ |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Commissioner denying Social Security benefits.[2] Plaintiff asserts that the Commissioner erred because (1) the ALJ failed to properly apply the Medical-Vocational Guidelines (the "Grids"); (2) the ALJ failed to properly determine Steps Two and Three of the sequential evaluation; (3) the ALJ failed to properly evaluate Plaintiff's credibility; (4) the ALJ failed to properly evaluate Step Five; (5) the ALJ failed to fully and fairly develop the record.  For the reasons discussed below, the Court **reverses and remands** the Commissioner's decision for further proceedings consistent with this opinion.

---

[1] This Order is entered in accordance with 28 U.S.C. § 636(c) and pursuant to the parties' Consent to Proceed Before United States Magistrate Judge.

[2] Administrative Law Judge Lantz McClain(hereafter "ALJ") concluded that Plaintiff was not disabled by decision dated March 8, 1994.  [R. at 35 - 49].  Plaintiff appealed the decision by the ALJ to the Appeals Council. The Appeals Council declined Plaintiff's request for review on August 7, 2004.  [R. at 5].  Plaintiff received a partially favorable decision by the ALJ on April 30, 2001, finding Plaintiff disabled beginning January 20, 1997, and ending November 1, 1998.  [R. at 58].

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born April 27, 1954. [R. at 91]. Plaintiff maintains that she has been unable to work since March 20, 1999. [R. at 91]. In her disability report, Plaintiff noted that she was 5'4 ½ " tall and weighed 275 pounds. [R. at 104]. Plaintiff indicated that she was unable to work due to nerve damage in her legs, severe depression, low back pain, chronic pain syndrome, and diabetes. [R. at 105]. Plaintiff wrote that she stopped working on March 20, 1999 due to a back injury. [R. at 105].

In her disability interview outline, Plaintiff described an average day. Plaintiff noted that she woke at 6:30 a.m. and watched news on the television. [R. at 122]. Plaintiff lays down when her back began to hurt and her legs became numb to ease her pain. [R. at 122]. Plaintiff believes that she sleeps four to five hours each night. [R. at 122]. Plaintiff noted that she wakes throughout the night with muscle spasms. [R. at 122]. Plaintiff indicated that she had gained weight over the prior four years due to less activity because of pain in her legs and back. [R. at 122]. Plaintiff prepares lunch and dinner. Plaintiff stands to wash items that she is cooking, and sits if she has to cut or dice anything. [R. at 123]. Plaintiff wrote that she could sweep her kitchen and bathroom and vacuum her two bedrooms, and after that Plaintiff was required to rest. [R. at 124]. Plaintiff shops for groceries about two times each month. Plaintiff watches television for approximately three hours each day, and reads some each day. [R. at 125].

Plaintiff had surgery on May 12, 1998 for her back, and was discharged on May 18, 1998. [R. at 242]. Plaintiff had a bilateral partial laminectomy, facetectomy, foraminotomy, and diskectomy. [R. at 242]. Plaintiff injured her back on January 20, 1997. [R. at 243].

Plaintiff was examined at the headache and neurological center of Oklahoma on January 7, 1999. [R. at 238]. Plaintiff had an abnormal EMG with evidence of polyradiculopathy. [R. at 238-39].

Plaintiff was examined January 14, 1998 by C. Scott Anthony, D.O. [R. at 265]. Plaintiff described pain in her lower back with radiation into her thighs. Plaintiff reported a difficult time performing daily activities. [R. at 265]. Plaintiff had a guarded gait and favored her right leg. Plaintiff underwent a lumbar discogram. [R. at 269]. The doctor determined that Plaintiff had a "two-level concordantly painful disc disease at L4-5 and L5-S1." [R. at 266].

On March 24, 2000, Plaintiff's doctor noted that Plaintiff continued to complain of lower back pain. Plaintiff also stated she had a fair degree of depression and anxiety. [R. at 263]. Plaintiff had a poor range of motion of her lumbar spine. [R. at 265]. Plaintiff reported some improvement on Paxil for depression, but recent irritability. The doctor increased her Paxil. Plaintiff noted she was planning to enroll in school. [R. at 261]. On February 5, 2001, C. Scott Anthony, D.O., wrote that Plaintiff was his patient and was unable to work due to her pain. [R. at 260].

Plaintiff was examined by Sri K. Reddy, M.D., on September 27, 2001. [R. at 137]. Plaintiff complained of low back pain dating back to 1997. Plaintiff had surgery in May 1998 and indicated she suffered from daily pain after the surgery which radiated to both hip regions. Plaintiff's past medical history indicated diabetes and arthritis in her lower back. Plaintiff's medications included Paxil, Ultram, Neurontin, and Vioxx. [R. at 137]. Plaintiff complained of occasional headaches and shortness of breath with exertion. [R. at 138]. Plaintiff was 5'4" and 282 pounds. [R. at 138]. Plaintiff's eyesight, without glasses in the

left eye was 20/50, and in the right eye was 20/70. [R. at 138]. Plaintiff's muscle strength was 5/5 in her upper and lower extremities. Plaintiff had functional range-of-motion at the shoulder, elbow, wrists and fingers in upper and lower extremities. Plaintiff's lumbar spine flexion was limited to 80 degrees due to pain. [R. at 138]. Plaintiff indicated that she used a walker to get out of bed and had been using it since her back surgery. Plaintiff did not have a walker at the exam and ambulated without assistance with good balance for 50 to 60 feet. [R. at 139]. The doctor's impressions were: chronic low back pain, diabetes, and obesity. [R. at 139]. The doctor completed a range-of-motion chart indicating that Plaintiff had full range of motion with the exception of her back, which had some limitations due to pain. [R. at 140].

On October 23, 2001, Plaintiff was examined by Larry Vaught, Ph.D. [R. at 145]. Plaintiff reported depression. Plaintiff indicated she was injured while working in January 1997. Plaintiff had surgery in May 1998 and reported ongoing back pain, tingling, and numbness. [R. at 145]. Plaintiff indicated she had not worked since the back surgery. [R. at 145]. Plaintiff stated that her appetite was not very good although she had gained 70 pounds since her injury. [R. at 146]. Plaintiff reported difficulty sleeping, shopping when possible, and some limited sweeping and vacuuming. [R. at 146]. Plaintiff's affect was flattened and at times she was tearful. [R. at 147].

A Psychiatric Review Technique Form was completed by Burnard L. Pearce, Ph.D., on November 19, 2001. He indicated that Plaintiff's medical impairment was not severe. [R. at 150]. Plaintiff's restrictions of daily living were mild; difficulties in maintaining social functioning were "none;" difficulties in maintaining concentration were "none;" and insufficient evidence to determine repeated episodes of decompensation. [R. at 160].

Dr. Anthony, on September 12, 2000, wrote to Plaintiff's attorney. He indicated that Plaintiff continued to do reasonably well with regard to her pain, was experiencing some discomfort, but had been able to attend school and had been reasonably active. [R. at 169]. On March 6, 2001, Dr. Anthony noted that Plaintiff was doing poorly with her pain. [R. at 168]. He observed that Plaintiff had recently fallen and experienced discomfort in her right and left shoulders. [R. at 168]. On October 16, 2001, Dr. Anthony wrote a letter on behalf of Plaintiff to the Social Security Disability Department. He noted that he believed Plaintiff could lift and carry 10 pounds frequently, lift 10 pounds occasionally, sit for up to six hours in an eight hour day, for time frames broken up into two hour increments with fifteen minutes break in between. He noted Plaintiff could stand and walk for approximately two to three hours in an eight hour work day and stand or walk for approximately one hour at a time. [R. at 167]. He concluded that Plaintiff would be a candidate for sedentary work. [R. at 167]. C. Scott Anthony, M.D. saw Plaintiff on October 22, 2001 for a follow-up examination. He noted that Plaintiff continued to have back pain and additionally complained of vague symptoms in her upper and lower extremities in addition to neck pain. Worker's compensation injury involved only Plaintiff's lower back. The doctor noted that Plaintiff reported "bizarre side effects" including Vioxx causing her hair to break off and Ultram causing her to wheeze. The doctor noted that Plaintiff was applying for Social Security Disability, "but I do believe this will be somewhat difficult for her to get, because I do believe that she can pursue some kind of sedentary position." [R. at 166]. On December 20, 2001, C. Scott Anthony, D.O., wrote that, in his opinion, Plaintiff could be released from her care and could obtain her medications, including Vioxx, Paxil, and Ultram from her primary care physician. [R. at 165].

A Physical Residual Functional Capacity Assessment was completed by Thurma Fiegel, M.D., on November 17, 2001. [R. at 170-77]. She indicated that Plaintiff could occasionally lift ten or more pounds, frequently lift five to ten pounds, stand for at least two hours in an eight hour day, sit for about six hours in an eight hour day, and push or pull an unlimited amount. [R. at 171].

Kenneth R. Trinidad, D.O. wrote on April 3, 2000, that Plaintiff continued to relate problems with depression. [R. at 183]. In his opinion, Plaintiff had a "class II impairment" which correlated to a 10 percent permanent partial impairment to the whole person. [R. at 183].

Kenneth R. Trinidad, D.O., wrote a letter on behalf of Plaintiff dated February 18, 2002. He noted that Plaintiff was 47 years old and was injured in January 1997 while at work. An MRI scan of Plaintiff's lumbar spine revealed disk herniations and Plaintiff was referred to an orthopedist. Plaintiff had surgery in May 1998, a laminectomy and diskectomy. [R. at 179]. Plaintiff was released from care in December 1998 with a ten pound lifting restriction. Plaintiff continued to be symptomatic and was evaluated by Dr. Connor, a neurologist. EMG testing was abnormal suggesting bilateral radiculopathies. [R. at 179]. Plaintiff was referred to Dr. Mark Hayes and orthopedist. A CT scan of the lumbar spine indicated an apparently solid fusion and no additional surgery was believed needed. Dr. Trinidad evaluated Plaintiff in November 1999. Plaintiff saw Dr. Anthony for pain management and in December 2001 he indicated that Plaintiff's condition was stable. [R. at 180]. Further medications were denied by Plaintiff's insurance carrier, and Plaintiff's symptoms worsened when her medications were stopped. [R. at 180]. Plaintiff complained of constant pain and spasms in her lumbar spine that increased with bending, stooping, and

lifting. [R. at 180]. Plaintiff had difficulty sitting or standing for more than 30 minutes due to back pain. Plaintiff had pain in her legs and had depression. [R. at 180]. Plaintiff was, at the time of the examination, taking no medications. [R. at 180]. Plaintiff was 5'4" and 273 pounds. [R. at 180]. Plaintiff appeared depressed. Plaintiff was stiff in raising from a seated position. [R. at 180]. The doctor indicated that Plaintiff's condition had changed for the worse since her January 1997 back injury. In his opinion, Plaintiff had not achieved maximum recovery and needed additional treatment. [R. at 181]. He recommended Plaintiff be placed on Vioxx, Paxil, and Ultram. [R. at 181].

Plaintiff was admitted May 10, 2002, and discharged May 11, 2002. Plaintiff was admitted complaining of shortness of breath for the previous day. [R. at 185]. Plaintiff had anemia, diabetes, and hypertension. Plaintiff discharged herself from medical care against the medical advice of her doctor. [R. at 185]. Plaintiff noted that she was not followed on an outpatient basis for her diabetes, but purchased insulin "over the counter." [R. at 188]. With regard to her diabetes, Plaintiff reported that she had been treated the prior month at Neighbor for neighbor and was to be treated at the OU Internal Medical Clinic, but that Plaintiff did not follow-up with that appointment because she was moving. [R. at 190]. The doctor noted that Plaintiff would benefit from blood pressure medication. [R. at 190]. Plaintiff's electrocardiogram indicated normal sinus rhythm. [R. at 191]. Plaintiff's doctor noted that he repeatedly explained to Plaintiff the importance of treating her anemia and that Plaintiff was not interested in staying in the hospital, but was planning to leave against medical advice. [R. at 207]. Plaintiff also did not want blood drawn for testing. [R. at 210]. Plaintiff consented to a peripherally inserted central catheter. [R. at 230].

Plaintiff was seen at the Community Action Project on June 17, 2002. Notes indicated Plaintiff was diabetic and needed help with her medications. [R. at 235]. Plaintiff indicated her current medications included insulin for her diabetes. [R. at 237]. Plaintiff was again seen on September 23, 2002, and complained of coughing, wheezing, and a sore throat. [R. at 234]. On October 28, 2002, Plaintiff was seen at the Community Action Project. A physical examination form was completed, and noted that Plaintiff requested help with her medications. [R. at 233].

On a medications list dated January 20, 2004, Plaintiff indicated that she took Vioxx for chronic back pain, and Ultram for nerve damage to her legs.

Plaintiff was seen at St. Francis Hospital on April 4, 2004, complaining of chest pain and bilateral lower extremity pain. [R. at 18]. Plaintiff went to the emergency room complaining of a three month history of left-sided chest pain and left leg pain with swelling. [R. at 18]. Plaintiff indicated her chest pain had increased with her cold. Plaintiff complained of chronic back pain, a painful knot in her left leg, headache, dizziness, chronic pain in her right middle finger. [R. at 18]. The doctor's impression was chest pain with probably pulmonary embolism. [R. at 19]. X-rays dated April 4, 2004, were interpreted as indicating Plaintiff's heart size within normal limits, and lungs showing density within both bases. The doctor noted this could be due to overlaying soft tissue rather than infiltrate. [R. at 15]. A Chest Computed Tomography Routine (CT) dated April 5, 2004, was interpreted as indicating suspected filling defects within the small branch arteries to the right lower lobe, raising a concern for pulmonary embolus. [R. at 16]. A venous examination on April 6, 2004, indicated normal bilateral lower extremities. [R. at 20]. A pulmonary arteriogram on April 7, 2004, showed no evidence of pulmonary embolus. [R.

at 22]. An "echo routine" dated April 7, 2004, was interpreted as indicating generally normal size and function of Plaintiff's heart. [R. at 23]. A CT of Plaintiff's abdomen was interpreted as possibly indicating an enlarged uterus. [R. at 24]. Plaintiff was discharged on April 8, 2004. [R. at 25]. The discharge notes indicated that Plaintiff's blood sugars were erratic and reflected poor overall diabetes control. [R. at 26]. Plaintiff indicated that she had been purchasing insulin on her own to control her diabetes. [R. at 26].

Plaintiff testified before the ALJ on August 23, 2000. [R. at 276]. At the hearing, Plaintiff's attorney noted that Plaintiff's medical record contained an abnormal EMG report in January 1999, and noted that five years had passed since that report and requested that an additional EMG report be ordered. [R. at 282].

Plaintiff lives in an apartment with her 31 year old son. [R. at 284]. Plaintiff testified that her son is mentally retarded with the mental faculties of a ten or twelve year old. [R. at 284]. Plaintiff's son requires no personal care assistance, but requires her supervision. [R. at 285].

Plaintiff was 49 years old at the time of the hearing, and was born April 27, 1954. [R. at 285]. Plaintiff is 5'4" tall and stated that her current weight was around 230. [R. at 285]. Plaintiff previously weighed around 280, but had lost weight since her last hearing before the ALJ. [R. at 286].

Plaintiff testified that she uses a walker to pull herself up out of her bed, but does not require the walker throughout the day. [R. at 286]. Plaintiff graduated from high school and had some limited training at a vocational technical school. [R. at 286].

Plaintiff stopped working January 20, 1997. Plaintiff was taking care of a patient and the patient slammed a door up against Plaintiff's body when Plaintiff attempted to enter the

patient's room. Plaintiff began experiencing pain in her legs and had difficulty walking. [R. at 287]. Plaintiff had surgery to assist with her pain. [R. at 287].

Plaintiff testified that she is unable to work due to chronic back pain. [R. at 292]. Plaintiff stated that the pain radiates into her hips and her legs and is equally painful on both sides. [R. at 292]. Plaintiff also stated that she has difficulty with her left leg swelling. [R. at 292]. According to Plaintiff, the swelling is triggered by standing or walking on her leg for too long without sufficient rest. [R. at 292]. Plaintiff also noted that when she was hospitalized at St. John's hospital in 2000, her treating doctors told her that she might have congestive heart failure because Plaintiff felt as though she had pain in her chest on her left side. [R. at 293]. According to Plaintiff, the pain occurs daily. [R. at 293]. Plaintiff's chest pain also makes her back pain feel worse. [R. at 294].

Plaintiff believes she can stand for approximately 15 minutes at one time. After 15 minutes Plaintiff's foot swells. [R. at 294]. Plaintiff believes she can walk for approximately 15 minutes at one time, and sit for approximately one hour to one and one-half hours at one time. [R. at 295]. Plaintiff lays down about three times during each day depending upon the back pain that she is experiencing. [R. at 295]. Plaintiff also has difficulty squatting, kneeling, and bending. [R. at 295-96]. Plaintiff believes she can lift approximately 30 pounds about one time each day. [R. at 296]. Plaintiff can lift about ten pounds without significant difficulty. [R. at 297].

Plaintiff drives about three times each week to the laundry and to the grocery store. [R. at 297]. Plaintiff goes to the movies about two times each month. [R. at 298]. Plaintiff reads for about 30 minutes at one time. Plaintiff does not require assistance to do laundry at the laundromat or to go to the grocery store. [R. at 298]. Plaintiff is able to clean her

bathroom, and Plaintiff cooks about three times each week. [R. at 299]. Plaintiff stated that she has difficulty cleaning the bathtub because she is required to get on to her knees and had to pull herself up. [R. at 299]. Plaintiff attends church three times each week. [R. at 300].

Plaintiff stated that she has difficulty with depression. Plaintiff suffers from crying spells, difficulty sleeping, and it has affected her appetite and ability to concentrate. [R. at 301].

## II. SOCIAL SECURITY LAW AND STANDARD OF REVIEW

The Commissioner has established a five-step process for the evaluation of social security claims. *See* 20 C.F.R. § 404.1520. Disability under the Social Security Act is defined as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment
> . . . .

42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act only if his

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy. . . .

42 U.S.C. § 423(d)(2)(A).[3]

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity (as defined at 20 C.F.R. §§ 404.1510 and 404.1572). Step Two requires that the claimant demonstrate that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 1521. If claimant is engaged in substantial gainful activity (Step One) or if claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, claimant's impairment is compared with those impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). If a claimant's impairment is equal or medically equivalent to an impairment in the Listings, claimant is presumed disabled. If a Listing is not met, the evaluation proceeds to Step Four, where the claimant must establish that his impairment or the combination of impairments prevents him from performing his past relevant work. A claimant is not disabled if the claimant can perform his past work. If a claimant is unable to perform his previous work, the

The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed, and (2) if the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).

The Court, in determining whether the decision of the Commissioner is supported by substantial evidence, does not examine the issues *de novo*. *Sisco v. United States Dept. of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Qualls v. Apfel*, 206 F.3d 1368 (10th Cir. 2000); *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court will, however, meticulously examine the entire record to determine if the Commissioner's determination is rational. *Williams*, 844 F.2d at 750; *Holloway v. Heckler*, 607 F. Supp. 71, 72 (D. Kan. 1985).

"The finding of the Secretary[4/] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is that amount and type of evidence that a reasonable mind will accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Williams*, 844 F.2d at 750. In terms of traditional burdens of proof, substantial evidence is more than a scintilla, but less than a

---

Commissioner has the burden of proof (Step Five) to establish that the claimant, in light of his age, education, and work history, has the residual functional capacity ("RFC") to perform an alternative work activity in the national economy. If a claimant has the RFC to perform an alternate work activity, disability benefits are denied. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

[4/] Effective March 31, 1995, the functions of the Secretary of Health and Human Services ("Secretary") in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103-296. For the purpose of this Order, references in case law to "the Secretary" are interchangeable with "the Commissioner."

preponderance. *Perales*, 402 U.S. at 401. Evidence is not substantial if it is overwhelmed by other evidence in the record. *Williams*, 844 F.2d at 750.

This Court must also determine whether the Commissioner applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The Commissioner's decision will be reversed when he uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards. *Glass*, 43 F.3d at 1395.

### III.  ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ found that Plaintiff was not disabled by decision dated March 8, 2004. [R. at 35]. The ALJ found that Plaintiff had the RFC to perform sedentary work, including lifting or carrying 10 pounds frequently, standing or walking two hours in an eight hour day, and sitting six hours in an eight hour day. [R. at 46]. The ALJ referred to the Medical-Vocational Guidelines of Appendix 2 Subpart P of the Regulations (the "Grids") and noted that Plaintiff was 49 years old, high school education with no transferrable skills. The ALJ noted that the Grids directed a finding of "not disabled." The ALJ additionally relied on the testimony of a vocational expert and concluded that Plaintiff was not disabled.

### IV.  REVIEW

**Mechanical Application of Grids Requires Reversal**

Plaintiff was 49 years old at the time of the hearing before the ALJ. Plaintiff was within three months and one week of her 50th birthday. At age 49, application of the Grids directs a finding of not disabled. At age 50, all parties agree that under the Grids Plaintiff is disabled.

The regulations provide that in a "borderline age" situation the Commissioner will not mechanically apply the Grids.

> We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b). A borderline age situation exists if Plaintiff is within "a few months" or reaching an older age category. In this case, Plaintiff was within 13 weeks of the next age category. Generally, situations in which a Plaintiff is within three months and a few days of the next age category are treated as a borderline age situation. *See Daniels v. Apfel*, 154 F.3d 1129 (1998) (recognizing 45 days, two months, and three months and two days as being within borderline; seven and ten months not within borderline). The regulation is clear. If Plaintiff is within the borderline age category, the Commissioner will consider whether to use the older age category in evaluating Plaintiffs case.

Defendant does not dispute that Plaintiff was within a borderline age category. In fact, Defendant asserts that the ALJ "acknowledged that a borderline age situation existed by specifically stating that Plaintiff was forty-nine years of age and that her birthday was in April." Defendant's Brief at 1. Defendant asserts, however, that if a borderline age situation exists that the Plaintiff has the burden of establishing that the use of the higher age category is appropriate given the Plaintiff's vocational adversities. Defendant's argument, that Plaintiff bears a burden with regard to the applicability of the borderline age factors, has already been considered and rejected by the Tenth Circuit Court of Appeals.

In *Daniels v. Apfel*, the Tenth Circuit Court of Appeals addressed the borderline age situation.

> [T]he Commissioner argues that Mr. Daniels has the burden of showing he should be classified in the higher age bracket, and that he failed to meet this burden. . . .
> 
> * * * *
> 
> Whatever the merits of this position outside the borderline area, we find it inapplicable to borderline situations because it ignores § 404.1563(a). Applied to borderline situations, this position essentially places the burden on a claimant to prove why the grids should not be applied mechanically. Nothing in § 404.1563(a) supports this position. The regulation provides that once it is determined that a claimant is in a borderline situation, which, as noted earlier, the Commissioner has defined solely in terms of age relative to the next category, "*We*" – meaning the Social Security Administration – *"will not apply these age categories mechanically."* The Commissioner's argument rewrites the regulation to say essentially that "in borderline situations, we will allow you– the claimant – to prove why the grids should not be applied mechanically." The plan language of the regulation does not allow this interpretation.
> 
> Moreover*,* placing the burden on the Commissioner of determining in the first instance what age category to apply is consistent with the Commissioner's existing burdens. Application of § 404.1563(a) is a step-five issue, and the burden generally is on the Commissioner at step five.

*Id.* at 1134.

The ALJ in this case did not discuss Plaintiff's borderline age. Application of the Grids, if Plaintiff was 50, would direct a finding of disabled. Plaintiff was three months and one week shy of her 50th birthday at the time of the hearing before the ALJ. The Court finds that the failure of the ALJ to discuss the borderline age situation is error. On remand, the ALJ should consider the borderline age situation in accordance with *Daniels v. Apfel*, 154 F.3d 1129 (1998).

Dated this 27th day of February 2006.

                                                */s/ Sam A. Joyner*
                                                Sam A. Joyner
                                                United States Magistrate Judge